**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 12-23-DLB-JGW**

**SMA PORTFOLIO OWNER, LLC, et al.**                                            **PLAINTIFFS**

**vs.**

**CORPOREX REALTY & INVESTMENT, LLC, et al.**                          **DEFENDANTS**

***   ***   ***   ***

**CIVIL ACTION NO. 11-168-DLB-JGW**

**BANK OF AMERICA, N.A.**                                                                **PLAINTIFF**

**vs.**

**CPX MADISON PLACE OFFICE, LLC**                                          **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

In a series of cases, Plaintiff/Counterclaim Defendant Bank of America, N.A. (BOA) has brought breach of contract and foreclosure claims against the borrowers of three commercial real estate loans (CPX Tampa Gateway OPAG, LLC; CPX Olympic Building II, LLC; and CPX Madison Place Office, LLC), as well as breach of guaranty claims against the guarantor of those loans (Corporex Realty & Investment, LLC). The borrowers and guarantor have in turn filed counterclaims based on failed loan modification negotiations.

BOA has filed motions for summary judgment on its breach of contract and foreclosure claims against CPX Madison Place, LLC (Case No. 2:11-cv-168, Doc. # 234), and on the Defendant/Counterclaim Plaintiffs' counterclaims and affirmative defense (Case No. 2:12-cv-23, Doc. # 232; Case No. 2:11-cv-168, Doc. # 234). The Court heard oral

1

argument on BOA's motions on May 21, 2015. Tim Palmer appeared on behalf of BOA; Earl Messer appeared on behalf of the Defendants/Counterclaim Plaintiffs. At the conclusion of the hearing, the motions were submitted for decision. (Case No. 2:12-cv-23, Doc. # 261).

There is no genuine dispute that the loans are in default, no evidence BOA breached a provision in the loan documents giving the borrowers a right of first refusal, and the parties entered into binding pre-negotiation letters in which they waived all claims or defenses arising from the negotiations. Therefore, BOA's Motions for Summary Judgment on all remaining claims in Cases No. 2:12-cv-23 and 2:11-cv-168 **are granted**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In Case No. 2:12-cv-23, BOA brings breach of guaranty claims against Defendant/Counterclaim Plaintiff Corporex Realty & Investment, LLC (Realty) concerning three commercial loans: the Tampa loan (Count I), the Olympic loan (Count II), and the Madison loan (Count III). The Court granted permission to intervene to the borrowers of the Olympic and Madison loans, Defendant/Counterclaim Plaintiffs CPX Olympic Building II, LLC (Olympic) and CPX Madison Place Office, LLC (Madison). (Doc. # 10). Because they were assigned the notes, SMA Portfolio Owner, LLC and SMA Issuer I, LLC were substituted as Plaintiffs for BOA on Counts I and II (Docs. # 34, 162); those claims have since been dismissed by agreed order (Docs. # 78, 206). In Case No. 2:11-cv-168, BOA has filed for foreclosure and breach of contract against Madison.

Realty has brought counterclaims for breach of the implied covenant of good faith and fair dealing and promissory estoppel; Madison has a counterclaim and affirmative

2

defense for breach of the implied covenant of good faith and fair dealing; and Olympic has counterclaims for breach of the implied covenant of good faith and fair dealing, promissory estoppel, and breach of contact (i.e., the right of first refusal).  The Court consolidated these two cases for discovery purposes.  (Doc. # 63).[1]

## A.     The Loans, Guarantee, and Default

In  October  2006,  Madison  executed  a  $33.5  million  promissory  note  to  BOA[2] secured by a mortgage on a Northern Kentucky office building known as CPX Madison Place.  (Doc. # 232-6, 7).  Realty guaranteed the loan.  (*Id.* Ex. 12).  Pursuant to Section 12.1 of the note, Madison was required to meet a debt coverage ratio of 1.10 to 1.0 as of August 31, 2010.  (*Id.* Ex. 6).  On October 25, 2010, BOA notified Madison that it had failed the debt coverage test and that it had thirty days to pay down the principal, or the loan would be in default.  (*Id.* Ex. 16).  Madison never cured the debt coverage default.  (Docs. # 232-2 at 5; 13 at ¶ 31).  On November 30, 2010, BOA sent Madison and Realty a notice of default, demanding immediate payment of all sums due under the note.  (Doc. # 1 Ex. I).  The loan matured on October 31, 2011, Madison never repaid the balance, and Madison has made no payments since April 2012.  (Doc. # 232-5, 6).

In December 2005, Olympic executed a $11,250,000 promissory note to BOA secured by a mortgage on a Northern Kentucky office building known as Olympic II.  (*Id.* Exs. 8, 9).  Realty guaranteed payment of the loan.  (*Id.* Ex. 13).  The Olympic note matured on February 1, 2011, Olympic never repaid the balance, and BOA declared the

---

1)  Unless otherwise noted, all citations to the record refer to the lead case, No. 2:12-cv-23.

2)  The Madison, Olympic, and Tampa notes were originally executed to LaSalle Bank, N.A.  (Doc. # 1).  BOA is the successor by merger to LaSalle.  *Id.*

3

loan in default on March 1, 2011.  (*Id.* Exs. 10, 23).

In January 2008, CPX Tampa Gateway OPAG, LLC (Tampa) (Realty, Madison, Olympic, and Tampa collectively "Corporex")[3] executed a $9,740,00 promissory note to BOA secured by a mortgage in a Florida hotel.  (*Id.* Ex. 11).  Like with the Madison and Olympic notes, Realty guaranteed the Tampa loan.  (Ex. 14).  The Tampa note had a February 1, 2011 maturity date, Tampa never repaid the balance, and BOA declared it in default on March 1, 2011.  (*Id.* Exs. 11, 23).[4]

> Each of the loan agreements granted the respective borrower a right of first refusal:

> Lender agrees that in the event that it determines to assign or sell the Note or any portion thereof to any person or entity not affiliated with Lender, Lender shall, provided Borrower is not then in default under this Note or any of the Loan Documents, allow Borrower or Borrower's affiliates a right of first refusal to purchase same, which right of refusal must be exercised and completed within thirty (30) days of the date Lender provides Borrower with written notice of the terms and conditions of a proposed assignment or sale.

(*Id.* Exs. 6, 8, 11).

## B.    The Pre-Negotiation Agreements

On December 13, 2010, BOA sent Madison and Realty a Pre-Negotiation Letter (PNL) for the Madison loan.  The PNL stated that BOA would "discuss the Loan with [Madison and Realty] representatives, provided that the following agreement and

---

3)  When appropriate, the Court will refer to these parties collectively.

4)  BOA filed for foreclosure on the Tampa loan in the Middle District of Florida.  (Case No. 2:14-cv-172).  After the parties stipulated to a dismissal of the foreclosure claim (Doc. # 259), Judge Steven D. Merryday denied BOA's Motion for Summary Judgment on Tampa's counterclaims for breach of the implied covenant of good faith and fair dealing, promissory estoppel, and breach of the right of first refusal (Doc. # 267).  He then transferred the case to this Court on September 22, 2014. (Doc. # 269).  The Tampa loan is relevant in Case No. 2:12-cv-23 because Realty brings counterclaims for breach of the implied covenant of good faith and fair dealing and promissory estoppel based on its guaranty of the Tampa loan.

understandings govern." (*Id.* Ex. 19).   The agreement contained the following relevant terms:

> 1. <u>Negotiations</u>. Any discussions . . . relating to the Loan and the Loan documents that Borrower, Guarantor and/or their representative may have previously had, or in the future may have, with representatives of Lender (any and all such previous and future discussions, negotiations, correspondence and other communications being hereinafter referred to as "Loan Communications") are not binding upon any of Borrower, Guarantor or Lender. Lender is not under any obligation to discuss, pursue or agree to any modifications, consents or approvals or assumptions of the Loan. No party hereto shall have any defense to any action by any other party, or assert any waiver by such other party, based on any Loan Communications.
>
> 2. <u>Releases</u>. Each party hereto completely, irrevocably and unconditionally releases . . . the other party from any and all . . . claims . . . whatsoever, in law or in equity, which such releasing party now has or may hereafter have against the other party . . . arising out of . . . any Loan Communications.
>
> 3. <u>No Reliance</u>. No officer, employee or representative of any party is authorized to commit such party orally to any agreement or to any modification of the Loan Documents, and no party may rely on any Loan Communication that may be construed to the contrary. While the parties may reach agreement on one or more preliminary issues . . . the parties agree that neither party shall be bound by any agreement on individual issues unless and until (1) agreement is reached on all issues; and (2) the parties' agreement on all issues has been reduced to a written agreement and signed by authorized representatives of all of the parties.
>
> \*\*\*   \*\*\*   \*\*\*   \*\*\*
>
> 5. <u>Discussions</u>. Any party hereto may discontinue negotiations at any time upon notice, written or oral, without any liability or obligation to the other party.

*Id.*

William Butler, in his capacity as CEO (Butler is Chairman of the Corporex entities (Doc. # 251-2 at ¶ 3)), signed the PNL on Madison's and Realty's behalf, while Leslie O. Andren, in her capacity as Senior Vice President, signed on BOA's behalf.  (Doc. # 232-19). On February 1, 2011, BOA sent Corporex similar PNLs for the Tampa and Olympic loans,

5

which Butler also signed.  (*Id.* Exs. 20, 21).

## C.   The Negotiations

The following description of the parties' negotiations concerning the three loans is taken from evidence in the record and draws all reasonable inferences in Corporex's favor. *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008).

In August 2009, Corporex contacted BOA regarding the August 31, 2010 debt coverage test on the Madison loan.  BOA informed Corporex that it wanted to "work" with them on the loan, but that it was a bad time to take any action that would require an appraisal due to the recession and resulting decline in commercial real estate values. (Doc. # 251-5 at 86:15-89:10; Ex. 6 at 55:20-62:24).  In May 2010, Corporex again met with BOA to discuss the debt coverage test.  At that time, BOA told Corporex that if the Madison property appraised at an amount equal or greater to the outstanding balance, BOA could "work around" the debt coverage issue.  (*Id.* Ex. 5 at 97:2-21).

In August 2010, the parties held a conference call to discuss how they could reach an agreement to extend or modify all three loans.  During the call, Corporex told BOA that it had received a refinancing offer for the Olympic loan.  After asking Corporex about the terms of the refinancing offer, BOA told Corporex not to accept it because it could arrange a better deal.  (*Id.* Ex. 5 at 106:10-20; Ex.6 at 62:9-63:20).  BOA then instructed Corporex to make a proposal to extend or modify all three loans. (*Id.* Ex. 5 at 106:17-20; Ex. 10 at ¶ 14).  After the call, Corporex ceased discussions with the lender offering the alternative refinancing option.  (*Id.* Ex. 5 at 109:5-110:13).  Corporex then submitted a loan modification proposal to BOA on September 8, 2010.  (Doc. # 232-15).

6

As part of the debt coverage test, BOA had the Madison property appraised. Although the appraisal value came back for more than the balance owed, it was not enough to satisfy the debt covenant.  (Docs. # 232-16; 251-7 at 83:5-85:6; 251-8 at 52:9-13).  In response,  BOA sent Corporex a letter on October 25, 2010, informing them that it had thirty days to make a $4.5 million principal payment in order to prevent the Madison loan from going in default.  (Doc. # 232-16).  The parties then held a conference call, during which BOA employee Phil Cole told Corporex that the letter was just a "matter of procedure" and that BOA would respond to Corporex's September loan modification proposal.  (Doc. # 251-5 at 140:9-142:21).  After the call, it was Corporex's and Cole's understanding that Corporex was not required to make the payment demanded in the letter. (*Id.* Ex. 2; Ex. 7 at 146:15-19).  In an affidavit, Butler states that Corporex had the financial ability to cure the debt coverage default.  (Doc. # 251-2 at ¶ 13).  However, that statement is directly contradicted by a December 22, 2010 letter to Andren, wherein Butler states: "the maximum amount of cash we can muster within our resources for initial principal reductions is $3,000,000."  (Doc. # 252-3).

On November 1, 2010, BOA sent its first counteroffer to Corporex's September modification proposal, which Corporex rejected by sending another proposal.  (Docs. # 232-17; 251-14).  Shortly thereafter, BOA, Madison, and Realty signed the PNL.  From that time forward, the parties continued to exchange "term sheets" in an attempt to reach an agreement.  (Doc. # 232-23, 24, 25).  Each offer from BOA contained the following disclaimer:

> The terms and conditions are provided for discussion purposes only and this letter does not constitute an offer, agreement or commitment to lend or renew at this time.

> The actual terms and provisions upon which the Bank may extend credit to Borrower are subject to necessary credit committee approval, satisfactory review of documentation and such other requirements as determined by the Bank in its sole discretion.

(*Id.* Exs. 17, 23, 24, 25).

In a January 2011 conference call, Andren indicated that BOA could do a three-year extension on the Madison loan in return for a $3 million principal payment. (Doc. # 251-5 at 165:8-15; 180:5-7). Corporex had originally asked for a four-year extension on the Madison loan. (Doc. # 232-15). For Corporex, getting a long-term extension on the Madison loan was a key part of the negotiations because it would have put Corporex in a better position to negotiate a lease extension with the Madison property's anchor tenant. (*Id.* at 116:4-24; Ex. 6 at 29:20-33:25). On March 15, 2011, Andren informed Corporex that BOA would not be able to grant a three-year extension on the Madison loan, but would only be able to extend the loan to February 2013 (which would amount to approximately a sixteen-month extension).[5] (Doc. # 251-5 at 198:17-24).

In April 2011, the parties agreed on an outline to modify the three loans, which by that time were all in default. (*Id.* Ex. 5 at 209:24-212:9). In mid-June, BOA sent over the draft modification documents. (Doc. # 232-27). The documents contained different and additional terms than Corporex had agreed to, which prompted the parties to hold a June 22, 2011 conference call. (Doc. # 251-5 at 230:1-20; Ex. 19). After that call, it was Corporex's position that the parties had reached an impasse, while it was BOA's

---

5) As BOA noted at oral argument, even if it had granted a three-year extension on the Madison loan's October 31, 2011 maturity date, that extension would have expired by now, meaning the Madison note would still be mature and the outstanding balance now due. (Doc. # 232-6).

understanding that Corporex would be providing a list of its objections.  (*Id.* Ex. 5 at 232:6-7; Doc. # 232-28).  The day after the conference call, Corporex sent BOA a letter rejecting BOA's offer, acknowledging that it was "aware of the potential implications of not executing the documents [BOA] sent."  (Doc. # 232-29).  BOA brought the breach of guaranty action against Realty a week later.  (Doc. # 1).

## D.    BOA Internal Discussions and Procedures

During this negotiation process there were, of course, internal discussions and procedures taking place at BOA with respect to the three loans.  On August 26, 2010, Cole told another BOA employee that he was informed by "DR" that BOA was to "get ours first for [Corporex]," to which the other employee responded "[a]gree.  We are first at table." (Doc. # 251-9).  Corporex asserts that D.R. is a "high-ranking Bank officer."  (Doc. # 251 at 4).  There is also evidence that some BOA employees did not expect Corporex to accept BOA's initial counter-proposal on the loan modifications.  (*Id.* Ex. 8 at 103:14-15). Specifically, in a September 30, 2010 e-mail, Cole states:  "I really don't think this is a solution, more a[n] attempt to show that we thought about it prior to starting the transfers." (*Id.* Ex. 11).

In November 2010, BOA began the process of downgrading Corporex's loans, which would ultimately lead to BOA transferring the loans to the Special Assets Group (SAG). (*Id.* Ex. 3 at 108:5-110:20; Ex. 4 at 48:6-14).   BOA informed Corporex that it was transferring the loans to the SAG before the parties signed the PNLs.  (*Id.* Ex. 5 at 150:8-151:20).  BOA told Corporex that the SAG would have "more flexibility," but did not explain what that meant.  *Id.*

In addition to preparing the loans for transfer to the SAG, a November 22, 2010 e-mail chain shows that BOA was in the process of decreasing its "exposure strategy" for the loans.  (*Id.* Ex. 15).  The conversation begins with Cole informing a group of co-workers that he planned to recommend changing Corporex's exposure strategy from "decrease" to "out."  *Id.*  Two employees responded that they agreed with the "out" designation.  "Out" is defined in the e-mail in the following manner:

> <u>Out</u> - Credit exposure is unacceptable at any level.  New requests should not be entertained for existing loans renewed except as a means to accomplishing a complete payout.

*Id.*  BOA never informed Corporex that it had changed its exposure strategy on the loans to "out."  (Doc. # 251-2, 10).

On November 30, 2010, the Corporex loans were formally transferred to the SAG.  (Doc. # 232-39 at 131:23-132:24).  At that time, the Madison loan was in default due to the debt coverage trip, while Tampa and Olympic were still performing.  (Doc. # 251-2 at ¶ 9).

## E.     The Sale of the Olympic and Tampa Loan

As discussed *supra*, BOA was required to give the respective borrower the right of first refusal before it "determined" to sell the loan, so long as the borrower was not in default.  (Doc. # 234 at Exs. 6, 8, 11).  In September 2011 (six months after they went into default), BOA sold the Tampa and Olympic loans without offering them to the corresponding borrower.  (Doc. # 251-14 at 344:15-25).

BOA employee Gary Katunas (a SAG member assigned to the Corporex loans), testified that he thought about the possibility of selling the loans in December 2010.  (Doc. # 251-16 at 211:3-212:13).  Discussions concerning a possible sale of the loans then heated up in June 2011, when BOA employees began determining which loans to include

10

in a bulk sale of commercial loans knows as the "Atlas Portfolio." (Doc. # 232-31, 32, 33, 34, 35; Doc. # 251-21). At first, the Madison loan was the only Corporex loan included in the proposed sale, with BOA adding the Tampa and Olympic loans to the portfolio on August 2, 2011. (Doc. # 232-36; 38 at 377). Although originally included in the portfolio, to date BOA has not sold the Madison loan. (Doc. # 232-2 at 9).

**F.    Additional Evidence in the Record**

1.      In an October 31, 2010 internal report accompanying the transfer of the Corporex loans to the SAG, BOA indicated that an extension on the loans was not likely. (*Id.* Ex. 39 at 134:14-20).

2.      In a December 1, 2010 email, Andren told Cole that if Corporex did not respond to the Madison default letter, "BOA [would] go straight to litigation and foreclosure." (*Id.* Ex. 44 at 119:19-126:10).

3.      In a March 18, 2011 e-mail chain, Andren had a discussion with a hotel receiver about the Tampa location, telling her "[t]he site does not know anything yet, so mum's the word for now." (Doc. # 251-17).

4.      On June 10, 2011, just days prior to BOA sending over the final draft modification agreement (which Corporex rejected), Andren told a BOA employee that she had directed another party to "immediately start the suits of the guarantor." (*Id.* Ex. 20).

## III.    ANALYSIS

**A.    Standard of Review**

At summary judgment, a court views all evidence and draws all inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244 (1986).

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On the other hand, summary judgment is improper when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. To defeat a properly supported motion for summary judgment, the non-moving party must cite to evidence in the record. Fed. R. Civ. P. 56(c).

## B.    Applicable Law

Under the choice-of-law provisions in the respective contracts, Ohio law governs the loan documents, whereas Kentucky law governs the PNLs. (Doc. # 232-2 at 12; Exs. 6, 8, 11, 19, 20, 21). The parties disagree over which state's law governs the promissory estoppel claim: BOA asserts that Kentucky law applies; Corporex contends that Ohio law governs. However, Corporex suggests that because both states have adopted the Restatement (Second) of Contracts' definition of promissory estoppel, the result would be the same under the law of either state. (Doc. # 251 at 29 n. 9). The Court agrees and will therefore belabor the point no further. *See Limbright v. Hofmeister*, No. 5:09-cv-107, 2010 WL 3385346, at *4 (E.D. Ky. Aug. 25, 2010) ("If the laws of both states would produce the same result, there is a 'false conflict' and no further [choice of laws] analysis is necessary.").

## C.    The Madison Loan

Starting with the Madison loan, BOA moves for summary judgment on Madison's

and Realty's breach of the implied covenant of good faith and fair dealing counterclaim and affirmative defense (Doc. # 85 at Count 1; Case No. 11-cv-168, Doc. # 16), its foreclosure and breach of contract claims against Madison (Case No. 2:11-cv-168, Doc. # 1), and its breach of guaranty action against Realty (Doc. # 1 at Count III).   BOA contends that Madison and Realty released the ability to raise breach of the implied covenant of good faith and fair dealing by agreeing to the PNL.   (Doc. # 232-2 at 17).   The Court will first address whether the PNL is enforceable,[6] and then turn to the parties' claims.

### 1.   *The Madison PNL is supported by consideration and it was properly executed*

Like any contract, a release must be supported by consideration.  *Waddle v. Galen of Kentucky, Inc.*, 131 S.W. 3d 361, 365 (Ky. Ct. App. 2004).  "Mutual promises constitute adequate consideration if a benefit is conferred to the promisor or a detriment is incurred by the promisee."  *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013).

Madison and Realty argue that the PNL is not supported by consideration because it did not obligate BOA to discuss a loan modification nor require BOA to release a known claim.  (Doc. # 251 at 23-24).  Judge Merryday concluded that BOA suffered a detriment when it in entered into the PNL because by doing so it delayed foreclosing on the Madison loan.  *SMA Portfolio Owner, LLC v. CPX Tampa Gateway OPAG, LLC*, 2014 WL 4545804,

---

6)  In adjudicating BOA's motion to dismiss Corporex's counterclaims, the Court held that it could not consider the PNLs because Corporex did not refer to or rely upon the PNLs in its Complaint. (Doc. # 84 at 14).  The Court noted that Corporex "should be afforded an opportunity to take discovery and present evidence concerning the validity and enforceability of the releases."  *Id.* Corporex has had that opportunity, and because this matter is now at the summary judgment stage, the PNLs are properly before the Court.

at *7 (M.D. Fl. September 12, 2014).  This Court agrees.

Additionally, the parties mutually agreed that no prior Loan Communications were binding upon them, that no party would have a defense based on Loan Communications, and that they would release all claims they had or would thereafter have related to any Loan Communications (except for Madison's and Realty's obligations under the loan documents).  (Doc. # 232-19 at  § 1).  Madison and Realty cite case law holding that a release does not constitute consideration if the releasor does not have an existing claim to waive.  *George v. First Am. Bank*, No. 1973, 1991 WL 156532, at *6 (Ohio Ct. App. Aug. 14, 1991).  However, unlike the releasor in *George*, 1991 WL 156532, at *6 n. 3, BOA also released all *future* claims based on Loan Communications.  As long as a party has a good faith belief that it is giving up a claim, the relinquishment constitutes valid consideration. *Hall v. Fuller*, 352 S.W.2d 559, 561 (Ky. 1961).  This lawsuit is evidence enough that BOA had a good faith belief it would potentially have future claims and defenses based on the parties' negotiations.   Taken together with the additional detriments and promises discussed above, the release provides sufficient consideration to support the PNL.

In the alternative, Madison and Realty argue that the PNL is not enforceable because Andren did not have authority to sign it on BOA's behalf.  (Doc. # 251 at 24). Even assuming *arguendo* that Andren had no authority to sign the Madison PNL, Madison's and Realty's argument ignores the doctrine of ratification, under which "a principal may later approve the actions of an agent who acted without authority." *Kindred Nursing Centers Ltd. P'ship v. Leffew*, 398 S.W.3d 463, 467 (Ky. Ct. App. 2013) (quoting 3 Am. Jur. 2d Agency § 176 (2013)).  A corporation can ratify an agent's actions when it receives the benefits or advantages of that action. *American Convalescent Centers, Inc.*

14

*v. Daniel*, 514 S.W.2d 192, 194 (Ky. 1974).  BOA accepted the benefits of the PNL when it began negotiating under the PNL's terms and by seeking to enforce the PNL in this action.  Moreover, Madison and Realty knew that BOA would not negotiate a loan modification until the PNLs were in place.  Therefore, once BOA sent over the proposed term sheets and resumed negotiations, Madison and Realty were put on notice that BOA had accepted the agreement.   (Doc. # 251-5 at 150:25-151:5; Doc. # 232-22); *Peay*, 406 S.W.3d at 837 (stating that a party can except a contract by its actions, "particularly where one has signed and both parties thereafter act as if they had a binding contract").

### 2.    *The Madison PNL was not fraudulently induced*

Finally, Madison and Realty argue that BOA fraudulently induced them to enter into the PNL.  (Doc. # 251 at 22-24).  In a related case dealing with the Tampa loan that has since been transferred to this Court, the Honorable Steven D. Merryday ruled that there was a question of fact whether the Tampa PNL was fraudulently induced.  (Case No. 2:14-cv-72, Doc. # 267); *SMA Portfolio Owner, LLC*, 2014 WL 4545804, at *7.  In its Response and at oral argument, Corporex has suggested that this Court should reach the same conclusion with respect to the Madison and Olympic PNLs.  (Doc. # 251 at 22).

For several reasons, however, the Court will conduct its own review of the arguments, case law, and record.  First, Federal Rule of Civil Procedure 56(a) directs that courts "*shall* grant summary judgment if the movant shows there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Although parties can be precluded from relitigating certain issues, preclusion is an affirmative defense that must be pled and proved.  *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) ("[A] party asserting preclusion must carry the burden of establishing all necessary elements." (citing 18 Wright

15

& Miller § 4405, p. 83)).  Corporex has never argued (much less proven) that BOA is precluded from litigating the validity of the Madison PNL, neither in its briefing nor at oral argument.  Thus, it would be improper for this Court to rely solely on Judge Merryday's ruling without conducting its own analysis.  *See Neff v. Flagstar Bank, FSB*, 520 F. App'x 323, 327-28 (6th Cir. 2013) (holding that a district court committed reversible error by raising the issue of res judicata *sua sponte* with no arguments from the parties).

Second, some of the facts in this case are different.  The PNLs were entered into by different parties and they concern different loans.  The parties agreed to the Tampa PNL more than two months after the Madison PNL.  And unlike Tampa, Madison has never alleged that it passed up on a refinancing opportunity, a factual dispute that Judge Merryday relied on in his ruling.  *SMA Portfolio Owner, LLC*, 2014 WL 4545804, at *7. Finally, in concluding that reasonable reliance (an essential element of fraudulent inducement) could not be decided at summary judgment, Judge Merryday cited an Ohio case.  *Id.*  However, Kentucky law governs the PNLs before this Court.  (Doc. # 232-19 at ¶ 19; 20 at ¶ 11).

Like with issue preclusion, Madison and Realty did not plead fraudulent inducement as an affirmative defense.  In fact, the Court denied Madison and Realty leave to file a third amended counterclaim to include fraud because Madison and Realty filed it on the eve of the dispositive motion deadline and nearly twenty months after the deadline to amend the pleadings had passed.  (Docs. # 229, 248).

However, unlike with issue preclusion, the parties have fully briefed and argued the fraudulent inducement issue.  "The failure to raise an affirmative defense by responsive pleading does not always result in waiver."  *Moore, Owen, Thomas & Co. v. Coffey*, 992

16

F.2d 1439, 1445 (6th Cir. 1993).  This exception is particularly appropriate when the opposing party has notice of the defense and therefore an opportunity to respond.  *Id.* Corporex attempted to add fraud as a counterclaim and raised the defense in its response to BOA's motion for summary judgment both here and in the Tampa action.  Because BOA has had an opportunity to formulate a response, the Court will entertain the merits of this argument.

When a party relies on a fraudulent representation in entering into a contract, it can rescind the agreement.  *Radioshack Corp v. Comsmart, Inc.*, 222 S.W.3d 256, 261 (Ky. Ct. App. 2007).  When the allegation is fraud in the inducement, the party seeking rescission must prove the following by clear and convincing evidence: (1) a material representation, (2) that is false, (3) was known to be false or made recklessly, (4) was made with inducement to be acted upon, (5) was acted in reliance upon and (6) caused injury.  *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. Ct. App. 2010); *Coffey*, 992 F.2d at 1444; *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 578 (Ohio 1998) (same elements under Ohio law). Because fraud entails a heightened burden of proof, the party alleging fraud  "must show in opposition to the motion for summary judgment that he can produce evidence which, if believed, will meet the higher standard."  *Bassett v. Nat'l Collegiate Athletic Ass'n.*, 428 F.Supp. 2d 675, 682 (E.D. Ky. 2006) (citing *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 944 (6th Cir.1990)).

The false misrepresentation "must be made concerning a present or pre-existing fact." *Filbeck v. Coomer*, 182 S.W.2d 641, 643 (Ky. 1944).  When the allegation concerns representations about future intentions, the party alleging fraud must show that when the other party made the representations "he had no intention of carrying them out[.]"  *Major*

*v. Christian Cnty. Livestock Market*, 300 S.W.2d 246, 249 (Ky. 1957).  Finally, "[i]t is well established under Kentucky law that 'equity will give no relief to a complaining party who has means of knowledge of the truth or falsity of representations . . . .'"  *Coffey*, 992 F.2d at 1447 (quoting *Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1008 (Ky. 1931)).

Madison and Realty allege that the Madison PNL was an integral part of BOA's scheme to lull them into false negotiations so that it could push all the loans into default and sell them.  (Doc. # 251 at 23) (Although BOA originally offered the Madison loan for sale, it was never sold).  BOA responds that Madison and Realty were unreasonable in relying on BOA's prior promise to negotiate because the PNL's express language states that BOA had no duty to negotiate.

As a threshold argument, Madison and Realty cite an Ohio Court of Appeals case that states "[t]he Ohio Supreme Court has also held that 'reasonable reliance' . . . cannot be resolved on a summary judgment motion."  *Bunton v. Trucase Tool & Mold, Inc.*, No. 92-L-140, 1993 WL 164648, at *2 (Ohio Ct. App. May 7, 1993) (citing *Kelly v. Georgia-Pac. Corp.*, 545 N.E.2d 1244, 1250 (Ohio 1989)).  This argument is beside the point because the parties agreed that Kentucky law would govern the Madison PNL.  (Doc. # 232-19 at ¶ 19).  In Kentucky, so long as there is no genuine dispute of material fact, reasonable reliance can be decided as a matter of law at summary judgment.  *See Basset*, 428 F.Supp.2d at 682 (granting summary judgment on a fraud claim because the plaintiff was "unable to prove reasonable reliance").  Moreover, the whole "point of Civil Rule 56 is to prevent claims from going to a jury when the court, after drawing all inferences in favor of the non movant . . . determines that no reasonable jury could make such a finding."

18

*Newman v. Twp. of Hamburg*, 773 F.3d 769, 773 (6th Cir. 2014).

Either way, the Ohio Supreme Court has never held that reasonable reliance cannot be decided at summary judgment.  In *Kelly*, the case the *Bunton* court cites, there were simply questions of fact that precluded summary judgment.  *See Kelly*, 545 N.E.2d at 1249-50.  Ohio appellate courts have subsequently held that although reliance is a factual issue, "a court may deem certain circumstances objectively unreasonable, as when it finds that reasonable minds could come to but one conclusion."  *Mansfield Square, Ltd. v. Big Lots, Inc.*, No. 08AP-387, 2008 WL 5159930, at *4 (Ohio App. Ct. December 9, 2008).  The Court will now determine whether a reasonable juror could find, by clear and convincing evidence, that Madison and Realty reasonably relied on BOA's promise to negotiate.

When a party alleges that it relied on a fraudulent statement, that reliance must be "reasonable . . . or 'justifiable.'"  *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (quoting Restatement (Second) of Torts § 537 (1977)).  When the party alleging fraud is a sophisticated entity and the statement concerns a business representation, "the law imposes . . . a duty to exercise common sense."  *Id.*; *see Bassett* ("With respect to reliance, [a party] must prove that his reliance on the misrepresentation was reasonable, and in making this determination, the Court should consider [the party's] knowledge and experience.").  Of particular relevance here, "parties may not base a fraud in the inducement claim on their reliance on oral representations contrary to the terms of written agreements or disclaimers that they have acknowledged in writing."  *Fifth Third Bank v. Waxman*, 726 F.Supp. 2d 742, 752 (E.D. Ky. 2010) (citing *Rivermont Inn., Inc. v. Bass Hotels Resorts, Inc.*, 113 S.W.3d 636, 640 (Ky. Ct. App. 2003)); *see also Govaerts v. Suntec Indus. Inc.*, No. 1:09-CV-147-M, 2010 WL 2178517, at *7 (W.D. Ky. May 26, 2010)

("As for reliance, it is true that where a contractual provision directly and unambiguously contradicts the alleged misrepresentation, reliance on the misrepresentation is unreasonable.").

The following cases demonstrate the heavy burden a borrower asserting fraud faces when a written agreement expressly contradicts the oral representations he claims he relied on.  In *Branch Banking and Trust Co. v. Thompson*, an appellate court reversed a jury's verdict that a forbearance agreement (which contained releases) was fraudulently induced by a bank's oral promise to re-amortize a loan.  No. 06-CI-010885, 2011 WL 255149, at *22 (Ky. Ct. App. Jan. 28, 2011).  The court held that the borrower's reliance was unreasonable because the forbearance agreement's terms disavowed such a promise.  *Id.* at *21-22. The forbearance agreement contained similar language to the Madison PNL, stating that the lender was "under no obligation" to agree to a future forbearance.  *Id.* at *12.

In *Helton v. American General Life Insurance Company*, a group of borrowers alleged that a lender fraudulently induced them to purchase life insurance policies.   No. 4:09-CV-118-M, 2010 WL 2889666, at *1 (W.D. Ky. July 21, 2010).  According to the borrowers, the lender failed to follow through on his promise that he would continually renew the loans as long as the borrowers needed them to pay the policies' annual premiums.  *Id.*  Yet, the loan documents stated that the lender was under no obligation to renew the loans, so the court held that the borrowers "could not show that they justifiably relied upon the alleged misrepresentations and their fraudulent inducement claim fails as a matter of law."  *Id.* at 3.

And in *Waxman*, a guarantor argued that a lender should not be able to collect on guarantees that she signed because the lender orally promised her that the guarantees

20

would not be enforced.  726 F. Supp.2d at 752.  The court rejected the guarantor's argument and entered summary judgment for the lender because a "claim for fraud in the inducement may not be based on alleged oral representations that are contrary to the terms of the guaranties . . . ."  *Id.* at 753; *see also Robins v. Global Fitness Holdings, LLC*, 838 F.Supp.2d 631, 647 (N.D. Ohio) (dismissing a fraudulent inducement claim because the defendant did not engage in any *conduct* "inconsistent with the unambiguous terms of the [parties'] written contracts").

Madison and Realty argue that BOA fraudulently induced them into signing the PNL in order to create the appearance that it was going to negotiate a modification, when in reality it had already determined not to extend the loan.  As the Court has previously recognized, an oral promise to negotiate is not contradicted by any of the promissory note's terms.  (Doc. # 84 at 21).  But the Madison PNL directly addresses modification negotiations.  In the PNL, the parties agreed to the following:

- The PNL constituted the entire agreement between them and superceded all prior agreements.  (Doc. # 232-19 at § 10).

- BOA was "not under any obligation to discuss, pursue or agree to any modifications . . . of the Loan."  (*Id.* at § 1).

- All previous discussions they had relating to the loan were not binding upon them.  (*Id.*).

- They could discontinue the negotiations at any time by providing notice.  (*Id.* at § 8).

In sum, the parties agreed that they were not bound by prior promises to negotiate or modify the loan, that BOA had no duty to negotiate in the future or to agree to a

21

modification, and that if negotiations did commence, they could be broken off by either party at any time.  If after agreeing to these terms Madison and Realty relied on BOA's prior oral promises to negotiate, either by declining other refinancing opportunities[7] or choosing not to actively pursue alternative refinancing options, then their reliance was unreasonable as a matter of law.  Put another way, Madison and Realty cannot now assert that BOA breached an amorphous "promise to negotiate in good faith," when the parties agreed in the PNL that BOA was under no obligation to discuss modifying the loan, and that if BOA did decide to negotiate, it could end the negotiations at any time.

At oral argument, Corporex pointed out that the PNL contained the following introductory paragraph:

> Lender will discuss the Loan with Borrower's and Guarantor's representatives, provided that the following agreements and understandings govern. . . . We want to confirm our mutual understanding that all discussions will be governed by the terms and conditions in this letter agreement . . . .

(Doc. # 232-19).  This paragraph in no way aids Madison's and Realty's fraudulent inducement defense.  The statement says nothing about promising to negotiate and provides no assurance that BOA will agree to a loan modification.  It simply states that BOA "will discuss the Loan" provided that the PNL's terms govern.  BOA did discuss the Madison loan with Corporex.  And although the parties never reached an agreement on a modification, neither party was obligated to do so according to the PNL.  (*Id.* at § 1).  In perhaps the most damaging term in the PNL as far as Madison's and Realty's fraudulent inducement defense, the parties agreed that they could "discontinue negotiations at any

---

7)  Madison and Realty have never alleged that they passed up on a refinancing opportunity based on BOA's promise to negotiate.

time."[8]  (*Id.* at § 8).  This written term alone renders unreasonable Madison's and Realty's reliance on BOA's early promises to negotiate a loan modification.

Even assuming *arguendo* that Madison and Realty justifiably relied on BOA's promise to negotiate, no reasonable juror could conclude that there is clear and convincing evidence BOA never intended not to agree to a modification.  Madison and Realty rely heavily on BOA's decision to change its exposure strategy on the loans to "out," and without the aid of context, that argument may appear to have merit.  However, BOA used the word as a term of art to describe internal bank procedure, so its own definition of "out" prevails over the word's everyday meaning.  In the e-mail discussing the change in exposure strategy, BOA defines "out" as: "[n]ew requests should not be entertained for existing loans renewed *except* as a means to accomplishing a complete payout."  (Doc. # 251-15) (emphasis added).  Thus, the "out" designation still allowed BOA to modify the loans.

In BOA employee Dave Betzold's deposition, he confirmed that "out" still allowed BOA to modify the loans: "My view of out was that we do not want to entertain any new business opportunities . . . .  We *could* continue to work through the existing portfolio, modify and extend . . . ."  (Doc. # 232-46 at 95-103).  Despite conducting extensive discovery, including deposing several BOA employees, Madison and Realty have offered no evidence in rebuttal.  Therefore, no reasonable juror could reach the conclusion that the

---

8)  The full agreement states that negotiations could be discontinued "without any liability . . . to the other party" "upon notice."  Before BOA filed suit, Corporex sent BOA a letter, stating that they believed the parties were "at an impasse," that they considered "the process regarding implementation of the April 21, 2011 term sheets unsuccessful," and that they were "aware of the potential implications of not executing the documents [BOA] sent."  (Doc. # 232-29).  Thus, notice does not appear to be an issue, nor was it raised by the parties.

"out" designation meant BOA had no intention to modify the loans.

The remaining evidence is likewise insufficient to create a genuine dispute of material fact whether BOA had no intention to modify the Madison loan when it entered into the PNL.  The evidence, viewed in the light most favorable to Madison and Realty, shows that some BOA employees were skeptical whether Madison and Realty would accept its offer (Cole's statement that he did not "think" BOA's offer was a solution); BOA drove a hard bargain (the additional terms BOA added in the final modification documents); and BOA had contingency plans in place–including foreclosure and a possible sale of the loans–in case the parties did not reach an agreement (Andren's order a few days before BOA made its final offer to start the suits of the guarantor).  As conceded by Corporex's counsel at oral argument, there is nothing nefarious or unusual about a commercial entity having a backup plan in the event negotiations fail.  As a publically-traded company, BOA may have even had a duty to its shareholders to do so.  BOA did not, however, have a duty to share those plans with Corporex.[9]   BOA's actions do not amount to fraud and do not suggest that it had no intention to agree to a loan modification; rather, they are indicative of two sophisticated parties negotiating, one in a stronger position than the other.

As a general matter, a mortgagee has no duty to reach an agreement on a loan modification with a mortgagor in default.  *See Travelers Ins. Co. v. Realty Properties, Inc.*, 798 F.Supp. 423, 424 (E.D. Ky. 1992); *MDFC Loan Corp. v. First Shopping Ctr. P'ship*, No. 93-C-4481, 1996 WL 99909, at *5 n. 4 (N.D. Ill. Mar. 1, 1996).  And even if BOA did bind itself to a duty to negotiate, it fulfilled its duty, and the following sequence of events took

---

9)  Unless, of course, BOA determined to sell the Madison loan prior to default, of which there is no evidence.

24

place: BOA sent an offer that contained terms Madison and Realty considered onerous and that the parties had previously not agreed upon; Madison and Realty rejected BOA's offer and stated that they considered the negotiations "unsuccessful"; BOA filed suit.  (Doc. # 232-27, 29).  Because no reasonable juror could conclude that there is clear and convincing evidence BOA fraudulently induced Madison and Realty to enter into the Madison PNL, the Court will enforce the parties' agreement.

### 3.   *The Madison PNL prevents Madison and Realty from raising breach of the implied covenant of good faith as a counterclaim and defense*

A release is an agreement in which one party surrenders the right to prosecute a cause of action against another.  *Frear v. P.T.A. Indus., Inc.*, 103. S.W.3d 99, 107 (Ky. 2003).  Like with any other contract, a court looks at the language of a release to determine the parties' intentions, and when that intent is clear, will apply it as written.   *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006).

In the PNL, all parties agreed to:

completely, irrevocably and unconditionally releases and forever discharge[] the other party from any and all liabilities, claims and demands whatsoever, in law or in equity, which such releasing party now has or may hereafter have against the other party caused by or arising out of or relating to all or any Loan Communications.

(Doc. # 232-2 at § 2).  The parties further agreed that "[n]o party hereto shall have any defense to any action by any other party . . . based on any Loan Communication."  (*Id.* at § 1).  Loan Communications are defined as "[a]ny discussions, negotiations, correspondence and other communications relating to the Loan and the Loan documents that Borrower, Guarantor and/or their representative may have previously had, or in the

25

future may have, with representatives of Lender." *Id.* at § 1.

Madison's and Realty's counterclaim and affirmative defense for breach of the implied covenant of good faith and fair dealing is based on their allegation that BOA made a false promise to negotiate modifying the Madison loan, and in doing so, interfered with their ability to perform on the loan agreements.  (*See* Doc. # 85 at Count I).  Yet, in the PNL, Madison and Realty unconditionally released BOA from all claims and defenses arising out of loan discussions, which undoubtedly includes BOA's previous promise to negotiate a loan modification.  Because Madison's and Realty's counterclaim and defense for breach of the implied covenant of good faith and fair dealing depends on loan communications, BOA is entitled to summary judgment.

Madison and Realty cite *Forry, Inc. v. Neundorfer*, 837 F.2d 259, 263 (6th Cir. 1988), for the proposition that a party cannot release claims of which it is unaware.  Madison and Realty allege that they were unaware of BOA's scheme to enter into false negotiations. But as discussed *supra,* there is no evidence that BOA never intended to modify the loans. Even when viewed in the light most favorable to Madison and Realty, the evidence at best supports a finding that BOA was unwilling to reach an agreement to modify the loans unless it was on its own terms–a position BOA was permitted to take.  *See Travelers Ins. Co.*, 798 F. Supp. at 424.

Next, Realty argues that a guarantor cannot not waive the right to raise a breach of the implied covenant of good faith and fair dealing as a defense, citing *O'Brien v. Ravenswood Apartments, Ltd.*, 862 N.E. 2d 549, 557 (Ohio Ct. App. 2006).  (Doc. # 251 at 14).   *O'Brien* is of dubious significance, since Kentucky law governs the PNLs. Nevertheless, in *O'Brien*, an intermediate Ohio appellate court held that a guarantor "did

not waive the right to raise the duty of good faith and fair dealing as a defense in the guaranty, where the parties did not expressly adopt a freely negotiated provision providing for such a waiver." *Id.* at 557.  In reaching this holding, the court cited no case law, referencing only "strong public policy."  *Id.*  Because this issue has not been addressed by the Ohio Supreme Court, *O'Brien* is only persuasive authority.  And even if *O'Brien* is the law in Ohio, it does not apply to a situation like the one here, where two sophisticated parties have freely negotiated and voluntarily agreed, for mutual consideration, to expressly release *any* defense arising from specific conduct (i.e., loan communications).

To be clear, the Court is not stating that the parties could agree to negotiate in bad faith.  Rather, Madison and Realty released all claims that may have arisen *prior* to the PNL, and then in the PNL, agreed to a structure for the negotiations *going forward*.  BOA acted within the framework set by the parties, and therefore Madison and Realty have no claim or defense.  *See Warner Theatre Assoc. Ltd. P'ship v. Metro. Life Ins. Co.*, No. 97 CIV. 4914 (SS), 1997 WL 685334, at *5 (S.D.N.Y. Nov. 4, 1997) (Sotomayor, J.) ("Where parties, particularly sophisticated ones . . . have undertaken certain obligations – and at the same time expressly limited those obligations – the courts should not normally interfere with those choices."); *DavCo Acquisition Holding, Inc. v. Wendy's Int'l, Inc.*, No. 2:07-CV-1064, 2008 WL 755283, at *6 (S.D. Ohio Mar. 19, 2008)  ("The duty of good faith and fair dealing may not be invoked to override express contract terms.  When a written contract is plain and unambiguous, it is not subject to attack based on standards of good faith and fair dealing merely because its operation will work a hardship on one party and accord advantage to the other.")

27

### 4.    *BOA is entitled to foreclosure on the Madison loan and a money judgment against Realty*

A plaintiff seeking foreclosure on a mortgage in Ohio must prove the following: (1) execution and delivery of a valid note and mortgage held by the plaintiff at the time the foreclosure is commenced; (2) a valid recording of the mortgage; (3) the debtor has defaulted on the note and mortgage; and (4) an amount due.  *Citizens Bank v. Cinema Park L.L.C.*, No. 1:08 CV 2174, 2010 WL 420019, at *3 (N.D. Ohio Jan. 29, 2010).

BOA has submitted evidence establishing each element of its money judgment, foreclosure, and breach of guaranty claims: (1) the Madison note and mortgage are signed by a Madison representative and currently held by BOA (Doc. # 232-6, 7; Case No. 11-cv-168, Doc. # 1 at ¶ 10); (2) the mortgage is time-stamped as having been recorded on October 23, 2006 (Doc. # 232-6); (3) Madison is in default for failing to meet the required debt coverage test in § 12.1 of the promissory note and for not repaying the loan upon maturity (*Id.* Exs. 5, 16); (4) the amount due is $32,464,218.18 as of September 2, 2014 (*Id.* Ex. 5); and (5) Realty guaranteed the loan (*Id.* Ex. I).

Madison and Realty argue that BOA should not be able to rely on Madison's default in seeking foreclosure and a money judgment, citing two cases in support.  (Doc. # 251 at 13-14 citing *Charter One Bank, F.S.B. v. Kobenald Corp.*, No. 01AP-886, 2002 WL 433621 (Ohio Ct. App. March 21, 2002), and *Ky. Joint Stock Land Bank of Lexington v. Smith*, 1932 WL 1933 (Ohio Com. Pl. May 19, 1932)).  In *Kobenald Corp.*, the appellate court reversed the trial court's ruling that a mortgagor was in default because the record was "confusing and incomplete."  2002 WL 433621, at *3.  Specifically, the mortgagee did not submit evidence establishing that the mortgagor had failed to make a monthly payment, the notice

28

of default referenced the wrong loan number, and the mortgagor stated in an affidavit that he had made all payments on time. *Id.* Meanwhile, in *Kentucky Joint Stock Land Bank of Lexington*, a mortgagee was estopped from foreclosing on a loan because it applied insurance proceeds from a fire on the mortgaged property to the principal instead of sending the proceeds to the mortgagor–in violation of Ohio law and against the mortgagor's wishes. 1932 WL 1933, at * 1-2. The mortgagor testified that if the mortgagee had distributed the insurance proceeds to him, he would have made all payments timely and thus stayed in compliance with the loan. *Id.*

The above cases involve circumstances not present here. Unlike the mortgagor in *Kobenald*, Madison does not dispute that it failed to comply with the debt coverage covenant and pay the loan upon maturity. And unlike the mortgagee in *Kobenald*, BOA has submitted evidence that establishes the Madison loan is in default. (Doc. # 232-5,6,7,12,16). *Kentucky Joint Stock Land Bank of Lexington* is completely dissimilar because there the mortgagee misappropriated insurance proceeds belonging to the mortgagor that the mortgagor could have used to stay in compliance with the loan. Both cases stand for the proposition that a mortgagee who causes a default should not be able to rely on that default in seeking foreclosure. Here, BOA may have initially told Madison and Realty not to worry about the debt coverage default while the parties were attempting to workout a loan modification. But that does not excuse Madison's failure to cure the default once negotiations ended nor its continued failure to repay the loan nearly four years after it matured.

Madison hypothesizes that if BOA had followed through on its promise to negotiate, it would have been able to avoid default by re-signing its anchor tenant to a lease

extension.  (Doc. # 251 at 39).  That theory is speculative at best and is rebutted by Butler's testimony that he did not inform the anchor tenant about the negotiations, as well as the anchor tenant's testimony that the move was based on logistics and location.  (Doc. # 232-42 at 36; Ex. 48 at 58).  Beyond speculative, this theory is also groundless: BOA had no duty to agree to a modification, so even if it breached a duty to negotiate, good-faith negotiations alone would not have helped Madison obtain a new lease agreement.  Because Madison and Realty have no defense, BOA is entitled to summary judgment on its foreclosure, money judgment, and breach of guaranty claims.

**D.    Olympic Loan**

Turning to the Olympic loan, BOA moves for summary judgment on Olympic's and Realty's counterclaims for the breach of the implied covenant of good faith and fair dealing and promissory estoppel, and Olympic's counterclaim for breach of the right of first refusal.  (Doc. # 85 at Counts I, II, VI).  The Court will once again turn to the parties' PNL.

### 1.    *The Olympic PNL is enforceable*

The Court's discussion of whether the Madison PNL is supported by consideration applies with equal force to the Olympic PNL.  The same can be said of the Court's analysis of whether the Madison PNL was fraudulently induced, with two caveats: different parties entered into the agreements, and the agreements were reached over two months apart.  Corporex, however, has pointed to no evidence that suggests the difference in parties and dates is material.  As with the Madison PNL, Olympic's and Realty's decision to rely on BOA's oral promise to negotiate was unreasonable as a matter of law, and further, there is no evidence that BOA never intended to negotiate modifying the Olympic loan as of

30

February 2011.

Olympic and Realty argue that the Olympic PNL is unenforceable for an additional reason: it required a signature but was not properly executed.  Although Andren eventually signed the Olympic PNL, she does not know when.  (Doc. # 251-3 at 193:16-194:21). Because it is not dispositive, the Court will assume *arguendo* that BOA did not properly sign the Olympic PNL.  That fact is only significant, however, if the Olympic PNL required BOA's signature.

Parties must mutually agree to be bound by a contract for it to be enforceable, which they can do through their words or conduct.  *Kellum v. Browning's Adm'r*, 21 S.W.2d 459, 463 (Ky. 1929).  So while parties can accept a contract by signing it, that is not the only means.  *Cowden Mfg. Co. v. Sys. Equip. Lessors, Inc.*, 608 S.W.2d 58, 61 (Ky. Ct. App. 1980) ("[I]t is not always necessary for both parties to sign a contract, particularly where one has signed and both parties thereafter act as if they had a binding contract."); *Polly v. Affiliated Computer Servs., Inc.*, No. CIV.A. 10-135-ART, 2011 WL 93715, at *2 (E.D. Ky. Jan. 11, 2011).  Only when the parties agree that a contact shall not be binding unless signed, or when a statute prescribes it, will a court require the parties' signatures.  *Allen v. Ford Motor Co.*, 8 F. Supp. 2d 702, 705 (N.D. Ohio 1998) ("Indeed, signature spaces in the form contract do not in and of themselves require that signatures of the parties are a condition precedent to the agreement's enforceability.") (quotation marks and citations omitted).

According to Olympic and Realty, it was the parties' intent that BOA had to sign the Olympic PNL in order for it to be effective.  In support, they point to Section 5 of the PNL, which states that "no compromise . . . [or] release . . . with respect to the Loan or the Loan

Documents shall constitute a legally binding agreement or have any force or effect whatsoever unless . . . signed by the authorized representatives of all necessary parties . . . ." (Doc. # 232-20).  Because the PNL contained a release, and made reference to "executing this letter agreement" and the "undersigned parties," Olympic and Realty suggest that the PNL itself had to be signed.  (*Id.*).

Contrary to Madison and Realty's argument, Section 5 does not apply to the PNL, but rather has prospective application.  As Judge Merryday recognized, the PNL is "an instrument for the parties' reaching" a *future* compromise.  *See SMA Portfolio Owner*, 2014 WL 4545804, at *6.  With no express provision requiring the parties' signatures, the isolated references to "executing this letter agreement" and "the undersigned parties" does not lead to a reasonable inference that the parties' intended  BOA to have to sign the PNL in order for it to be effective.  Therefore, the Court will apply common law contract principles to determine whether BOA agreed to be bound.  *See id.*

Olympic and Realty argue that assent is a question of fact inappropriate at summary judgment, citing *Auffarth v. Nationwide Mut. Ins. Co.,* No. WDQ-08-1399, 2011 WL 3897939, at *6 (D. Md. Aug. 30, 2011).  While it is true that assent is a question of fact, when a party's actions leave no genuine dispute as to whether it accepted the contract, a court can decide the issue as a matter of law.  Fed. R. Civ. P. 56(a)*; see Sweeny v. Theobald*, 128 S.W.3d 498, 501 (Ky. Ct. App. 2004); *GeoSunFuels, LLC v. Gorman*, 493 F. App'x 713, 717-18 (6th Cir. 2012).

BOA manifested its assent to the PNL's terms on at least two occasions.  First, when it made the offer to enter into the PNL.  When a party makes an offer, it gives the offeree the power of acceptance, and by doing so manifests its assent to be bound by the

contract's terms.  *See Messick v. Powell*, 236 S.W.2d 897, 899-900 (Ky. 1951); *Jones v. Bank of Harlan*, No. CIV. 10-96-GFVT, 2012 WL 115586, at *3 (E.D. Ky. Jan. 12, 2012) (citing 17A Am.Jur.2d *Contracts* § 45 (2011).  The PNL BOA sent states that it "sets forth the agreement of the parties," and that BOA "will discuss the Loan . . . provided that the following agreements and understandings govern."  (Doc. # 232-20).  The terms and conditions in the PNL are sufficiently clear and specific.  Therefore, once Butler signed the PNL on behalf of Olympic and Realty and sent it back to BOA, there was a meeting of the minds and the contract became enforceable.

BOA also agreed to be bound by the PNL when it sent Olympic and Realty the term sheet proposals.  Andren told Olympic and Realty that she "would need to get those signed [PNLs] back from you before I can send written updated term sheets on all three loans." (Doc. # 232-22).  By following through on that promise and sending the term sheets after Butler signed the PNLs, Andren clearly and unequivocally expressed BOA's acceptance of the PNL.  All requirements for a valid contract having been meet, the Court will enforce the Olympic PNL.

### 2.     *The Olympic PNL prevents BOA from bringing counterclaims for breach of the covenant of good faith and promissory estoppel*

The Olympic PNL contained similar terms to the Madison PNL.  Specifically, the parties released any claims arising out of loan communications that took place before and after the parties signed the PNL, and further agreed that they were not bound by any oral promises to negotiate or modify the loan.  (Doc. # 232-20).  Therefore, as with the Madison Loan, Olympic's and Realty's counterclaim for breach of the implied covenant of good faith and fair dealing cannot stand.

The same can be said for Olympic's and Realty's promissory estoppel counterclaim. In support of promissory estoppel, Olympic and Realty argue that in "relying on [BOA]'s August 2010 and November 2010 promises to negotiate and work with Olympic to extend the terms of its loan, Olympic passed on other financing opportunities." (Doc. # 251 at 29). Because that allegation clearly depends on the parties' loan communications, which took place before they agreed upon a release in the February 2011 PNL, summary judgment is granted.

### 3.     *There is no evidence that BOA breached the right of first refusal provision*

The Olympic loan gave Olympic the following right of first refusal:

> Lender agrees that in the event that it *determines to* . . . sell the Note . . .
> Lender shall, *provided Borrower is not then in default* under this Note or any
> of the Loan Documents, allow Borrower or Borrower's affiliates a right of first
> refusal to purchase same . . . .

(*Id.* at Exs. 6, 8, 11) (emphasis added).  There is no dispute that Olympic never repaid its loan after it matured on February 1, 2011; that BOA declared the loan in default on March 1, 2011; and that BOA sold the loan in September 2011 without offering it to Olympic or Realty.  (Doc. # 232 Exs. 10, 23; Doc. # 251-14 at 344:15-25).  The critical issue is whether there is evidence that BOA "determined to" to sell the loan prior to default.

By prior Order, this Court gave "determines to" the following interpretation:

> The plain meaning of the word "determines" is clear and unambiguous.
> Merriam-Webster's Dictionary defines "determine" as "to come to a decision."
> *Merriam-Webster Dictionary*, available online at http://www.merriam-
> webster.com/dictionary/determine.  Clearly, BOA could first decide to sell the
> CPX Olympic loan before any actual sale was agreed to or took place.  The
> situation is analogous to a homeowner who desires to sell his house.  First,
> the homeowner *determines* to sell the house, and then he will put the house
> for sale on the market in order to find a buyer.  Thus, the plain meaning of the
> term "determines" in the CPX Olympic promissory note simply means

whenever BOA made a decision to sell the note.

(Doc. # 84 at 32).

Olympic suggests that BOA's change in its exposure strategy to "out," coupled with the remaining evidence, creates a genuine dispute whether BOA determined to sell the Olympic loan prior to February 2011.  Yet, as discussed *supra*, Olympic makes too much of this one word.  Nothing in the record supports Olympic's theory that "out" meant sell; to the contrary, the description accompanying the term, as well Betzold's deposition, directly contradicts such a conclusion.

BOA employee Gary Katunas states that he first learned about the right of first refusal provision in December 2010 and that the provision influenced BOA's decision making process. (Doc. # 251-16 at 211:3-212:13).  Contrary to Olympic's argument, this testimony does not lead to a reasonable inference that BOA decided to sell the loan at that time.  Based on the evidence in the record, the earliest a reasonable juror could conclude that BOA decided to sell the Olympic loan was in June 2011, when BOA first began discussing the portfolio sale that eventually included the Olympic loan.  (Doc. # 232-31, 32, 33, 34, 35, 36, 38 at 370-72).  Up until June 2011, BOA continued to discuss a potential loan modification–even though Olympic no longer had the right of first refusal because the Olympic loan, like all the Corporex loans, was in default.  Because there is no evidence that BOA decided to sell the Olympic loan prior to default, Olympic's breach of the right of first refusal counterclaim is dismissed.

## E.    Realty's Guaranty of the Tampa Loan

Last, the Court will address the Tampa loan.  Specifically, Realty's counterclaims for breach of the implied covenant of good faith and fair dealing and promissory estoppel.  In

35

Case No. 2:14-cv-72, Judge Merryday denied BOA's Motion for Summary Judgment on Tampa's counterclaims for breach of the implied covenant of good faith and fair dealing and promissory estoppel.   However, BOA asserts that Realty waived the right to assert counterclaims when it signed the guaranty.

A guaranty is interpreted like any other contract.   *U.S. Bank Natl. Assn. v. Green Meadow SWS L.L.C.*, 9 N.E.3d 433, 441 (Ohio Ct. App. 2014).   And like any other contract, a guarantor can waive future claims and defenses as a term within the guaranty.   *See Gen. Elec. Capital Corp. v. Steve Mox Trucking, Inc.*, No. 3:04CV7574, 2006 WL 2077038, at *2 (N.D. Ohio July 24, 2006) (citing *Buckeye Fed. Sav. & Loan Ass'n v. Guirlinger*, 62 Ohio St.3d 312, 316 (Ohio 1991)).   Section Four of the Tampa guaranty contains the following provision:

> Continuing Guaranty. Guarantor agrees that performance of Borrower's Obligations by Guarantor shall be a primary obligation, shall not be subject to any counterclaim, set-off, abatement, deferment or defense based upon any claim that Guarantor may have against Lender . . . and shall not be . . . affected in any way by . . . any failure, omission or delay on the part of . . . Lender to conform or comply with any term of any of the Loan Documents . . . [or] any action or inaction by Lender under or in respect of any of the Loan Documents . . . .

(Doc. # 232-14).

As BOA correctly points out, Realty has no damages with respect to the Tampa loan, and even if it did, it waived the right to bring counterclaims when it signed the guaranty.   (Doc. # 234-2 at 24-25, 35; Doc. # 252 at 15).   Because Realty is not the borrower, it cannot claim that it lost a refinancing opportunity or right to repurchase the loan; as the guarantor, its only conceivable damages would come from having to repay the Tampa loan.   However, Realty agreed that its obligation to repay the loan was not "subject

36

to any counterclaim or defense that Guarantor may have against the Lender."  Because Realty has no damages or cognizable claim, BOA's Motion for Summary Judgment is granted.

## F.   Damages

The Court has determined that BOA is entitled to summary judgment on its breach of contract claim against Madison and its breach of guaranty claim against Realty.  BOA has submitted an affidavit by Senior Vice President Gretchen Hart, with supporting business records, that establish Madison owes BOA $32,464,218.18 on the Madison loan as of September 2, 2014.  (Doc. # 232-5, Ex. C).  Other than their counterclaims and affirmative defenses, which this Court has dismissed as a matter of law, Madison and Realty offer no argument to dispute this amount.  In Realty's Answer, they admit that the principal owed on the Madison loan was $28,112,000 as of June 30, 2011.  (Doc. # 13 at ¶ 34).  The difference in what is now owed is due to interest accruing after default, which the parties agreed upon in the promissory note.  (Doc. # 232-6 at § 2.3).  Thus, BOA is entitled to a $32,464,218.18 money judgment against Madison and Realty with interest accruing at the default rate as of September 2, 2014.

BOA claims that under the Madison loan documents, it is authorized to pay insurance premiums, taxes, assessments, and other unpaid obligations, and then "recover all such amounts so disbursed, with interest accruing on the unpaid balance at the Default Rate until paid in full."  (Case No. 2:11-cv-168, Doc. # 1, Count IV).  In its Motion for Summary Judgment, BOA states that "for purposes of summary judgment only, [it] is only seeking to recover unpaid principal and interest."  (Doc. # 232-2 at 14).  BOA then reserves the right to seek additional fees and costs "[i]n the event this Court denies [its] Motion."

37

(*Id.*).  The Court has granted BOA's Motion in full, and to date, BOA has not made a claim for any of the additional expenditures referenced in Count IV.  Therefore, the Court will dismiss Count IV at this time, without prejudice.

## IV.    CONCLUSION

Accordingly, for the reasons stated herein:

1.    Bank of America, N.A.'s Motions for Summary Judgment (Doc. # 232 in Case No. 2:12-cv-23; Doc. # 234 in Case No. 2:11-cv-168) on CPX Madison Place Office, LLC's, CPX Olympic Building II, LLC's, and Corporex Realty & Investment LLC's counterclaims and affirmative defenses are **GRANTED**;

2.    Bank of America, N.A.'s Motion for Summary Judgment (Doc. # 234 in Case No. 2:11-cv-168) on its breach of contract (Count I) and foreclosure (Count II) claims against CPX Madison Place Office, LLC is **GRANTED**;

3.    Bank of America, N.A.'s Motion for Summary Judgment (Doc. # 232 in Case No. 2:12-cv-23) on its breach of guaranty claim (Count III) against Corporex Realty & Investment, LLC is **GRANTED**;

4.    Bank of America, N.A.'s claim for a Judgment for Additional Expenditures (Count IV in Case No. 2:11-cv-168) is **dismissed** without prejudice;

5.    A Judgment in favor of Bank of America, N.A. shall be entered concurrently herewith.

This 12th day of June 2015.



Signed By:

*David L. Bunning*

**United States District Judge**

38